## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **DAVID D. HICKS,** | ) | |
| | ) | **No. 13 CV 4817** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | **May 29, 2015** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION and ORDER

David Hicks claims that he became disabled on August 10, 2010, because he suffers from congestive heart failure, edema of the lower extremities, morbid obesity, gout, and back pain. After the Appeals Council declined to review the administrative law judge's ("ALJ") decision denying benefits to Hicks, he filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross motions for summary judgment. For the following reasons, Hicks's motion for summary judgment is denied and the Commissioner's motion is granted:

### Procedural History

Hicks applied for Supplemental Security Income ("SSI") benefits on August 11, 2010, claiming a disability onset date of August 10, 2010. (Administrative Record ("A.R.") 22.) His application was denied on October 29, 2010, and upon reconsideration on December 30, 2010. (Id.) At his request, Hicks received a hearing before an ALJ, which took place on November 21, 2011. (Id. at 47.)

Following the hearing, the ALJ issued a written decision finding that Hicks was not disabled. (Id. at 22-29.) The Appeals Council denied Hicks's request for review, (id. at 1-3), making the ALJ's decision the final decision of the Commissioner of the Social Security Administration. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Hicks filed this lawsuit on July 3, 2013, seeking judicial review, *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, (R. 6); 28 U.S.C. § 636(c).

## Facts

Many years of frequent cocaine use, heavy drinking, and poor diet precede Hicks's recent medical woes. In August 2010, a few days before his 45th birthday, Hicks, who suffers from obesity, sought medical care for shortness of breath, back pain, and declining functional ability. (A.R. 208.) Through a battery of examinations and tests, Hicks's treating physicians determined that Hicks had a "moderately severe" enlarged heart and experienced atrial fibrillation, and they ultimately diagnosed him with acute systolic heart failure. (Id. at 197, 274.) They also diagnosed Hicks with alcohol or cocaine-induced dilative cardiomyopathy. (Id. at 229.) Hicks also received treatment for gout. (Id. at 311, 356.) According to Hicks, these maladies impaired his mobility and rendered him unable to work. Hicks submitted documentary and testimonial evidence in support of his claim at his November 2011 administrative hearing.

**A.  Medical Evidence**

For much of his life Hicks consumed 10 to 12 cans of beer each day, used tobacco, and regularly snorted a mixture of cocaine and marijuana.  (A.R. 274, 423.) He sometimes also used heroin.  (Id. at 384.)  In the months preceding his August 2010 visit to the hospital, Hicks, already overweight, consumed large amounts of junk food and gained between 20 and 30 pounds in a relatively short period of time. (Id.)  There is no evidence that Hicks sought medical attention for his worsening physical condition at any time before he arrived in the Emergency Department at the Cook County Hospital on August 9, 2010.  (Id. at 196.)  At the time of his hospital admission, Hicks was in atrial fibrillation with rapid ventricular response. (Id. at 229.)  Hicks told the treating medical personnel that he could only walk two to three blocks before back pain or shortness of breath overtook him.  (Id. at 273.) Hicks also told the medical personnel that he believed his back pain was related to his weight and diet.  (Id. at 274.)  An echocardiogram showed ventricular and atrial dilation.  (Id.)  Hicks's heart rate was 120 beats per minute and his urine sample tested positive for cocaine.  (Id. at 270.)  Hicks was discharged three days later on August 12, 2010.  (Id. at 229.)  Hicks's diagnoses were atrial fibrillation, alcohol or cocaine-induced dilative cardiomyopathy, and systolic heart failure.  (Id.)  Upon discharge, Hicks was instructed to quit smoking, walk daily, limit his salt intake, and monitor his weight.  (Id. at 230.)

Hicks took the advice of his physicians to heart.  Beginning with his diagnosis in August 2010, Hicks regularly reported for his medical visits to monitor

his medications and to check his progress over the course of the following year. (See id. at 355, 357, 424, 428.) The majority of Hicks's medical visits through the spring and summer of 2011 focused on adjusting the dosage of Hicks's Coumadin medication that he was taking regularly to treat his atrial fibrillation. (See. e.g., id. at 413, 415, 417.) Treatment records from these appointments repeatedly note Hicks's professed abstinence from tobacco, cocaine, heroin, and alcohol beginning on the day of his diagnosis. (See id. at 376, 378, 381, 384-85.) By June 2011, after nine months of abstinence from substance abuse, his health improved. Hicks sought treatment for gastrointestinal problems, but he denied shortness of breath, abdominal pain, or weakness. (Id. at 394.) He received additional counseling on his diet, which was noted as "not good," (id. at 419), but Hicks's heart rate was under control and he had no complaints of palpitations or symptoms of heart failure. (Id. at 420.)

Concurrently with his treatment, Hicks sought assessments relating to his SSI application. All three of Hicks's residual functional capacity ("RFC") determinations took place within the first three months after his initial diagnosis. In October 2010, a State Disability Examiner, Dr. Charles Carlton, performed a consultative examination on Hicks and found that it was "possible" that Hicks's standing tolerance could be limited, but that he could safely sit, perform tasks that involve lifting 10 to 20 pounds, and walk greater than 50 feet without an assistive device. (Id. at 314.) Dr. Carlton also found that Hicks's range of motion was normal. (Id. at 314-15.) Later that same month, Dr. Charles Kenney authored a

RFC assessment finding that none of Hicks's conditions were of listings-level severity, and opining that he could stand or walk for at least two hours in an eight-hour workday, sit for approximately six hours in an eight-hour workday, and could frequently lift 10 pounds and occasionally lift 20 pounds. (Id. at 324-25.) Dr. Kenney also determined that Hicks was restricted from climbing ladders, ropes, or scaffolding, and from concentrated exposure to extreme heat, cold, humidity, odors, hazardous machinery, or heights. (Id. at 326-27.)

The following month, in November 2010, Hicks received another RFC assessment, this time from Dr. Michael Shapiro. Dr. Shapiro was among the physicians who treated Hicks when he was admitted to the Cook County Hospital on August 9, 2010. (See id. at 341-42.) According to Dr. Shapiro, Hicks could only stand or walk less than two hours in an eight-hour workday, and could only sit two hours in an eight-hour workday. (Id. at 334.) Dr. Shapiro also stated that Hicks would need a job that allows him to shift from sitting, standing, or walking at will, and to take a ten-minute break every two hours. (Id.) The reports from Drs. Carlton, Kenney, and Shapiro were all generated in the fall of 2010, and none of them was privy to Hicks's medical records from June 2011, the time when Hicks was asymptomatic of heart failure and when he denied shortness of breath.

After the administrative hearing, Hicks's counsel submitted a "Post-Hearing Memorandum," attaching an unauthenticated printout purporting to demonstrate that Hicks had "31 medical appointments" between August 25, 2010, and November 23, 2011. (Id. at 447-48.) The printout was accompanied by a letter from Hicks's

attorney claiming that Hicks was "vocationally unreliable for at least 12 months." (Id. at 447.)

## B.   Hicks's Hearing Testimony

At the November 2011 hearing before the ALJ, Hicks testified that he lives with his aunt and his mother in a building owned by his aunt.  (A.R. 51.)  He does not pay rent, is single, and has no children.  (Id.)  Although he is able to read and write, Hicks testified that he fell in with "the wrong crowds" and dropped out of high school.  (Id. at 52.)  Hicks testified that he does not have a driver's license. (Id.)  Except for a seasonal job as a laundry room attendant at a baseball park many years ago, Hicks has never worked.  (Id. at 52-53.)  At the time of his hearing, Hicks received $200 in food stamps each month.  (Id. at 52.)

Hicks testified that his physical condition prevents him from accomplishing even simple chores.   For example, Hicks testified that he cannot take out the garbage, make his bed, or wash the dishes because he cannot stand upright for long enough.  (Id. at 53.)  According to Hicks, he can walk half a city block at the most, but probably not even that far, before he has to stop because of shortness of breath. (Id. at 53, 58.)  Pain in his back and his leg occasionally prevent him from sleeping. (Id.)  Hicks's leg pain is caused by gout and he testified that he takes medication that relieves the pain for two to three hours before the pain returns.  (Id. at 54.) Hicks testified that his gout causes frequent swelling in his leg and that sometimes the swelling takes weeks to improve.  (Id. at 58.)  Hicks also testified that he has arthritic hands.  (Id. at 55.)  Notwithstanding these conditions, Hicks's testimony

also indicates that he has been making efforts to right the ship: he quit using cocaine and alcohol, attends monthly medical appointments, and is on various medications. (Id. at 54.)

The ALJ was skeptical of Hicks's testimony and it appears that this skepticism at times verged on hostility. (See id. at 55-57.) When questioning Hicks about a physician's report that Hicks was unable to stand and walk or sit for more than two hours at a time, the ALJ asked the following questions and Hicks provided the following answers:

> Q. And so it says that you could only stand and walk about two, less than two hours. Did he stand with you for two hours to see how long you could stand for?
> A. Yeah, but when I stand my back start [sic] hurting. Then I have to sit down.
> Q. Usually doctors are pretty busy. He stood with you for two hours though . . .
> A. No, he –
> Q. How did he know that?
> A. I guess he gave me an examination, test my back and stuff.
> Q. Yeah, did you tell him you couldn't stand more than two hours?
> A. No, my –
> Q. I'm sorry?
> A. My back was hurting, then he did a test then I told him not only my back would hurt. I could get out of breath.
> Q. Did he sit with you for two hours? How long did he know you could sit?
> A. No, he didn't sit with me two hours.
> Q. Well, how did he know you couldn't sit about two hours?
> A. He [inaudible] sitting how I be sitting and stuff.
> Q. You never discussed it with him?
> A. No, they told me.
> Q. They told you you could only sit for two hours?
> A. Uh-uh. See my back was [sic] used to be hurting, and I told them how far, you know I can sit. Then I be laying down, my back start hurting and then I have to lay down most of the time.

(Id. at 55-56.)

In an unusual turn at the conclusion of the hearing, Hicks's attorney conceded that Hicks's heart failure symptoms did not last 12 months, but nonetheless argued that the ALJ should consider "things that are not objectively identified in the medical evidence in terms of labs and tests." (Id. at 75.) Hicks's attorney identified Hicks's professed shortness of breath at his hearing, gout, and sleep apnea as conditions the ALJ ought to consider and described these as "comorbid conditions." (Id. at 76.)

## C.    The Medical Expert's Hearing Testimony

A medical expert ("ME") testified that Hicks suffered from congestive heart failure and that he has atrial fibrillation. (A.R. 59.) However, the ME characterized Hicks's post-diagnosis condition as "an excellent response to treatment," noting that Hicks's cooperation with his healthcare providers has been "meticulous," and that Hicks quit cocaine, alcohol, and nicotine "cold turkey." (Id. at 60.) The ME's testimony was bullish on Hicks's health. In support, he noted that by January 2011 Hicks was able to walk four blocks and manage a flight of stairs. (Id. at 62.) By March, medication had restored Hicks's blood pressure to normal, and by June Hicks reported no weakness, fatigue, heart palpitations, or shortness of breath. Or, as the ME put it, "[i]n other words there's no evidence for congestive heart failure." (Id.) The ME testified that Hicks continues to have gout but that it is under control with medication. (Id. at 63.) In July, approximately 11 months after his initial diagnosis, Hicks continued to have no evidence of congestive heart

failure. (Id. at 62.) In September 2011, Hicks's symptoms of congestive heart failure were still absent. (Id. at 63.)

In response to questioning by the ALJ about Hicks's limitations, the ME stated that Hicks could occasionally carry 20 pounds and could frequently lift 10 pounds. (Id. at 64.) Although the ME did not find limits in Hicks's ability to stand, walk, or sit, he testified that Hicks could never climb ladders, ropes, or scaffolding. (Id.) The ME expressly disagreed with Dr. Shapiro's 2010 opinion that Hicks could not perform any lifting activities at all. (Id. at 65.) On cross-examination, the ME testified that Hicks's congestive heart failure had not affected him for more than 10 or 11 months, and opined that Hicks's dutiful compliance with the advice of his doctors was responsible for his recovery. (Id. at 66 ("I think [Hicks's] response is the, sort of ideal response you like to get in a patient. And he has been just absolutely following things to a T, and I want to congratulate him on that.").)

**D.    The Vocational Expert's Hearing Testimony**

After the ALJ proposed a hypothetical RFC to the Vocation Expert ("VE") limiting a person to sedentary activities at the unskilled light exertional level that did not involve lifting more than 10 pounds regularly and 20 pounds occasionally, (A.R. 70-71), the VE testified that such a person was suitable for sedentary unskilled employment as a table or bench worker (Dictionary of Occupational Titles ("DOT") listing 734.687-014) of which there are approximately 63,000 jobs in Illinois. (Id. at 71.) Alternatively, the VE also opined that the hypothetical person in question could also work as an unskilled small parts assembler (DOT listing

734.687-018), a sedentary position for which there are approximately 79,000 jobs in Illinois. (Id. at 71-72.)  On cross examination the VE also stated that unskilled laborers may typically miss work only one day per month and are permitted a certain number of breaks: a 10-minute morning break, a 30-minute lunch break and a 15-minute afternoon break.  (Id. at 73.)

### E.    The ALJ's Decision

On March 1, 2012, the ALJ issued a decision finding that Hicks is not disabled within the meaning of the Social Security Act.  (A.R. 22-29.)   Applying the customary five-step sequence for analyzing disability claims, *see* 20 C.F.R. § 416.920, the ALJ found at step one that Hicks had not engaged in substantial gainful activity since his disability application date,  (A.R. 24.)  At step two, the ALJ determined that Hicks has a medically determinable impairment or combination of impairments that is "severe" within the meaning of 20 C.F.R. § 416.920(c), because he has a history of congestive heart failure, lower extremity edema, morbid obesity, and a history of alcohol and cocaine abuse.  (Id.)  At step three, the ALJ determined that Hicks's severe impairment did not meet or equal any of the listings in the listing of impairments because "[a]lthough he had significant symptoms of congestive heart failure, there is no evidence that it persisted for 12 consecutive months, nor do all of the impairments, considered together, equal a listing."  (Id.) Moreover, the ALJ pointed out that Hicks's medical problems were caused in large part by his substance abuse and poor diet.  (Id. at 27.)  The ALJ rejected Hicks's argument that damage to his heart from alcohol and drugs was permanent, finding

that "[t]he evidence clearly documents that as soon as he quit [cocaine and alcohol], he tremendously improved." (Id.)

Prior to turning to step four, the ALJ determined that Hicks has the RFC to perform light work as defined in 20 C.F.R. § 416.967(b), and that he may do work involving lifting and carrying 10 pounds frequently and 20 pounds occasionally, along with walking, standing, and sitting six hours in an eight-hour day, occasionally climbing ramps and stairs, but with no climbing ladders, ropes, or scaffolding, and no commercial driving. (Id.) In so finding, the ALJ did not consider Hicks to be "fully credible" primarily because the ALJ assessed Hicks's hearing testimony to be at odds with reports that his condition steadily improved. (Id. at 26.) The ALJ noted the discrepancy between the evaluations performed by Dr. Carleton in October 2010 and Dr. Shapiro in November 2010, but did not discuss the RFC assessment completed by Dr. Kenney, who opined that Hicks did not have any impairments that rose to listings level and could stand for two to six hours each day. (Id. at 25-26, 324-331.) According to the ALJ, Dr. Shapiro's RFC opinion "was based on the claimant's own subjective complaints, which, like his testimony is not fully supported by the evidence." (Id.)

Step four of the analysis required the ALJ to determine whether Hicks has the RFC to perform the requirements of his past relevant work, but because Hicks has no past relevant work, the ALJ moved on to the fifth step. (Id. at 23.) At step five, the ALJ determined that Hicks is capable of performing work that exists in significant numbers in the national economy. (Id. at 28.) Based on these findings,

the ALJ concluded that Hicks is not disabled and denied his application for disability benefits.

## Analysis

Hicks challenges several aspects of the ALJ's decision in his motion for summary judgment. Chiefly, Hicks argues that the ALJ erred by failing to adequately consider testimony that Hicks's anticipated absenteeism for medical appointments would render him unable to work, (R. 16, Pl.'s Br. 7-8), by failing to properly analyze conflicting medical opinions, (id. at 8), and by failing to properly assess his credibility, (id. at 14).

The court's role in reviewing the ALJ's decision is "extremely limited," and asks only whether the ALJ's decision is supported by substantial evidence. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). An ALJ will meet the substantial evidence standard so long as the ALJ relied on adequate record evidence and explained "why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The aim of the district court is not to "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder*, 529 F.3d at 413. Instead, the court will affirm the ALJ's decision "even if reasonable minds could differ" as to whether Hicks is disabled. *See Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009).

## A.   Medical Appointments

Hicks's first argument is that the ALJ failed to consider testimony related to his ability to remain employed in light of having to keep frequent medical

appointments. That assessment is not quite true. In his decision, the ALJ noted that:

> claimant put some emphasis on absences, which is not a medical finding and is not supported by the claimant's history. Nothing in his activities of daily living [] suggest[s] unreliability, particularly, his follow-up for medical treatment and his stopping the substance abuse, which suggests the opposite.

(A.R. 28.) Essentially, Hicks argues that if he has one anti-coagulation appointment per month and one appointment with Dr. Shapiro per month, he would need to be absent two days each month. (R. 16, Pl.'s Br. at 7.) Putting aside the issue of whether Hicks might have some control over when his appointments are scheduled, neither Hicks nor the Commissioner cite to any case law from this circuit or elsewhere discussing the need for frequent medical treatment as a factor in an ALJ's disability analysis. However, the Seventh Circuit has rejected a similar argument in *Bouchard v. Barnhart*, 38 Fed. App'x 332, 336 (7th Cir. 2002). In *Bouchard*, the Seventh Circuit affirmed the ALJ's decision to discredit the testimony of a treating physician who opined that his patient "would require a minimum of two months of unexpected absences per year," because "no other doctor was of the same view." *Id.* Unlike *Bouchard*, none of Hicks's physicians, not even Dr. Shapiro, rendered any medical opinion about required absences tied to Hicks's condition. Accordingly, this court cannot fault the ALJ, who is not a doctor, for declining to make a finding that the three physicians, including a testifying medical expert, also declined to make. Because Hicks has not convincingly shown that the

ALJ mishandled the evidence regarding his likely rate of absenteeism, he has not met his burden of showing that a remand is necessary with respect to this issue.

**B.      RFC**

Hicks next argues that the ALJ incorrectly evaluated the RFC opinion provided by Dr. Shapiro and ignored the opinion offered by Dr. Kenney. The starting point for an ALJ's analysis of discordant medical evidence is a prohibition against substituting his or her own opinion for that of a doctor. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Or, as the Seventh Circuit has put it, "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir. 1996). But despite these prohibitions, the ALJ is ultimately responsible for "resolv[ing] any conflicts in the medical evidence." *Williamson v. Astrue*, No. 08 CV 3906, 2010 WL 2858834, at *7 (N.D. Ill. Jul. 16, 2010) (citing *Diaz v. Chater,* 55 F.3d 300, 306 n.2 (7th Cir. 1995)).

Hicks is correct that the ALJ failed to mention Dr. Kenney's opinion by name. (See A.R. 22-29.) Dr. Kenney completed an RFC assessment for Hicks in October 2010, a little more than two months after Hicks presented to the emergency room. (Id. at 331.) The Commissioner concedes that the ALJ did not address Dr. Kenney's RFC assessment, but argues that the omission is harmless because his opinion does not run contrary to the ALJ's finding that Hicks is suitable for sedentary work. (R. 22, Govt.'s Br. at 5-6.) According to the Commissioner, "the court can be assured that the result would have been the same if the ALJ had considered and even

accepted Dr. Kenney's opinion." (Id.) Dr. Kenney opined that Hicks could sit for six hours and stand for at least two hours in a normal workday, (A.R. 325), and that Hicks must avoid concentrated exposure to extreme cold or heat, humidity, fumes and odors or poorly ventilated areas, and hazards such as machinery or heights, (id. at 328). In other words, Dr. Kenney's RFC opinion is slightly more protective of Hicks than the testimony of the ME who testified that Hicks did not require any limitations from extreme heat, cold, machinery, or fumes and odors. (A.R. 65.)

Errors in the ALJ's explanation do not warrant remand if, as correctly argued by the Commissioner, they are harmless. In analyzing harmless error, the Seventh Circuit has explained that:

> [i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.

*Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). To the extent that Hicks is actually arguing that the ALJ did not provide an adequate and logical bridge, the Seventh Circuit has explained that the harmless error standard applies. *See Schomas,* 732 F.3d at 707-08. Here, Dr. Kenney's RFC opinion largely contradicts the RFC opinion of Dr. Shapiro in that it supports the ability of Hicks to stand two hours per day and sit six hours per day, which supports a finding that Hicks is able to perform sedentary work. The end result might be different if the ALJ had ignored Dr. Shapiro's RFC opinion, but the ALJ devoted considerable space in his opinion to explaining his disagreement with Dr. Shapiro. (See id. at 26-27.) More importantly, Dr. Kenney's RFC opinion is consistent with the ALJ's determination

that Hicks can perform sedentary work. *See Frobes v. Barnhart*, 467 F. Supp. 2d. 808, 821, (N.D. Ill. 2006). Although Dr. Kenney's RFC opinion included environmental restrictions that the ALJ did not, neither of the two jobs the ALJ found Hicks can perform would expose him to the hazards Dr. Kenney sought to preclude. Specifically, the DOT does not reference exposure to any of Dr. Kenney's limitations in the occupations identified by the VE, table worker and small parts assembler. (Compare A.R. 71-72 with DOT 734.687-014, 734.687-018.) Accordingly, the ALJ's failure to explicitly discuss Dr. Kenney's opinion is harmless.

Hicks next argues that the ALJ improperly discounted the opinions of Dr. Shapiro, the only treating physician in the record. (R. 16, Pl.'s Br. at 8-14; Pl.'s Reply at 4-8.) This is a closer call. Dr. Shapiro's characterization of Hicks's health is by far the gloomiest one in the record. He found that Hicks could stand only for 20 minutes at a time and sit for only 2 hours. (A.R. 334.) The ALJ was skeptical of Dr. Shapiro's RFC assessment because "[c]ritical questions 5, 6, and 7 are not answered . . . [and] [q]uestion 10 is not based on anything in the record."[1] (Id. at 26-27.) The ALJ also found that Dr. Shapiro's RFC opinion, issued in November 2010, should not control the outcome of the disability application because it predated

---

[1] Question 5 states "[i]f your patient has pain, characterize the nature, location, frequency, precipitating factors, and severity of your patient's pain." (A.R. 333) Question 6 asks the physician to "[i]dentify the clinical findings and objective signs." (Id.) Question 7 states "[d]escribe the treatment and response including any side effects of medication that may have implications for working, e.g., drowsiness, dizziness, nausea, etc." (Id.) And Question 10 asks "[h]ow often during a typical workday is your patient's experience of pain or other symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks." (Id. at 334.)

Hicks's "tremendously improved" condition as described by the ME at the July 2011 hearing. (Id. at 27.) To be clear, an ALJ's refusal to assign controlling weight to a treating physician is not an error provided that it is inconsistent with other substantial record evidence. *See* 20 C.F.R. § 404.1527; *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). Here, the ALJ found that Dr. Shapiro's RFC assessment was incomplete and "conclusory" because he failed to provide the medical basis for his opinions. Although Hicks discusses *Oakes v. Astrue*, 258 Fed. App'x 38, 44-45 (7th Cir. 2007), to argue that the ALJ improperly weighed the testimony of a treating physician, *Oakes* was a case in which the ALJ "did not explain what was missing [from the treating physician's evidence] or why [the treating physician's] opinion was otherwise inadequate," id. (citations omitted.) By contrast, the ALJ found in this case that Dr. Shapiro's opinion was not well supported because he failed to answer numerous questions or identify medical evidence, was outdated, and was an outlier when compared to other substantial evidence in the record. Accordingly, the ALJ properly explained why he assigned little weight to Dr. Shapiro's opinion. *See Scott* 647 F.3d at 739 (7th Cir. 2011).

Another matter warrants some attention. The ALJ's statement that Hicks "admitted under oath that he told the doctor how long he could sit or stand, making the [RFC] collaborative," (A.R. 27), is inaccurate. Hicks consistently testified that physicians told him how long he could sit or stand. (Id. at 55-56.) The only possible information upon which the ALJ's statement can be based is illustrated here:

> Q. Okay. Alright. How'd [Dr. Shapiro] know you have to take breaks
> during an eight hour work day? Did you tell him how long? Do you
> take frequent breaks?
> A: Yeah.

(Id. at 56.) The ALJ's incredulity toward Hicks is evident from the transcript of the

hearing, (see id.), but haranguing him with three questions in a row before he has

time to answer does not produce a valid admission that Hicks told the doctors how

long he could sit or stand. From the hearing transcript, it is not clear which of the

ALJ's three questions Hicks was attempting to answer. (See id.) The transcript

also shows that the ALJ launched a barrage of questions at Hicks about how

Dr. Shapiro generated the RFC assessment for him but he is not qualified to answer

why or how Dr. Shapiro made his assessment. (Id. at 55-56.) The same logic behind

the prohibition of ALJs substituting their medical judgment for those of an expert,

certainly forbids ALJs demanding that the claimants themselves explain how

physicians arrived at a certain conclusion.

## C.    Credibility Determination

Hicks also challenges the ALJ's adverse credibility determination. "In

disability insurance cases, an ALJ's credibility determinations are 'afforded special

deference because the ALJ is in the best position to see and hear the witness and

determine credibility.'" *Eichstadt v. Astrue*, 534 F.3d 663, 667-68 (7th Cir. 2008)

(quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)). The Seventh Circuit

teaches that "an ALJ must consider several factors, including the claimant's daily

activities, [his] level of pain or symptoms, aggravating factors, medication,

treatment, and limitations." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

"An ALJ's credibility determination may be overturned only if it is 'patently wrong.'" *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013). Moreover, "[i]t cannot be too often repeated or too strongly stressed that 'of course, the Administrative Law Judge did not have to believe'" the claimant's testimony. *Rogers v. Colvin*, 37 F. Supp. 3d 987, 1001 (N.D. Ill. 2014).

The ALJ found that Hicks was not "fully credible" because his hearing testimony ran contrary to evidence of Hicks's improvement through his medical treatments. (A.R. 25-26.) The ALJ's assessment is borne out in the record. Although Hicks testified in his November 2011 hearing that he might be unable to walk even half a block, (id. at 53), this appears to be a pronounced overstatement of his limitations in light of numerous medical records showing that his symptoms of heart failure had improved or disappeared by the summer of 2011, (see, e.g., id. at 440 (Hicks reported that he could walk three to four blocks by January 2011); 403 (Hicks denied any shortness of breath, weakness or fatigue in June 2011); 423 (physicians noted in October 2011 that Hicks's hypertension, heart failure, and gout diagnoses were "well controlled")). His testimony also stands in stark contrast to the ME's testimony that Hicks's response to medical treatment has been "very, very good." (Id. at 62.) In fact, the ME testified that Hicks's course of treatment with Coumadin was actually conservative, because "the response has been so excellent." (Id. at 63.) Also, by June 2011, Hicks reported to his doctor that he was exercising. (Id. at 419.) In light of this record evidence and the ME's testimony that Hicks's

medical record showed "excellent" improvement, the ALJ's skepticism about Hicks's hearing testimony was not patently wrong.

Hicks next challenges the ALJ's mentioning that his "complaints of back pain were apparently not found severe enough by his treating sources to be addressed." (R. 16, Pl.'s Br. at 15.) Hicks argues, correctly, that the ALJ should not draw inferences from a claimant's lack of treatment without exploring why he did not seek treatment for his back pain. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008); (R. 16, Pl.'s Br. at 15.) But in this case, the ALJ found Hicks's back pain was not severe because the record included little evidence that he sought treatment for back pain in any of his numerous appointments, and in one of the few instances in which it is mentioned, the treating physicians determined that Hicks's spinal x-ray was "within normal limits." (A.R. 26.) A lack of any objective medical evidence, in combination with medical opinions conflicting with a claimant's testimony, is sufficient grounds to disbelieve a disability claimant's complaints of back pain. *See, e.g. Mueller v. Colvin*, 524 Fed. App'x 282, 285 (7th Cir. 2013). Given that Hicks bears the burden of proving his disability at steps one through four of the analysis, *see Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005), and considering that his treating physicians did not find any limitation caused by back pain that would prevent him from working, or provide any objective medical evidence at all even relating to his back pain beyond a normal x-ray image, (A.R. 61), the ALJ's disbelief of Hicks's allegedly severe back pain is well supported.

Hicks's final challenge to the ALJ's credibility determination is that the ALJ used "boilerplate" language. It is true that the Seventh Circuit has repeatedly criticized ALJs for employing boilerplate language in their credibility determinations. *See, e.g., Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012) (referring to language nearly identical to the ALJ's language in this case as "meaningless boilerplate"); *see also Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011) (criticizing an ALJ's determination as "perfunctory" because it included—with scant elaboration or factual support—boilerplate language). Nevertheless, an ALJ's use of boilerplate language does not itself warrant a remand "[i]f the ALJ has otherwise explained his conclusion adequately." *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). As discussed above, the ALJ's assessment of Hicks's credibility is sufficiently grounded in both medical evidence and expert testimony and is adequately explained.

## Conclusion

For the foregoing reasons, Hicks's motion for summary judgment is denied, the Commissioner's motion is granted, and the final decision of the Commissioner is affirmed.

**ENTER:**

Young B. Kim
**United States Magistrate Judge**